J-S18001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.E.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 17 MDA 2026 |

Appeal from the Order Entered December 3, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0089

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.N.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 46 MDA 2026 |

Appeal from the Order Entered December 3, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0088a

BEFORE:  DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY DUBOW, J.:          **FILED: JULY 13, 2026**

R.M. ("Father") appeals from the December 3, 2025 orders that terminated his parental rights to five-year-old J.M. and four-year-old A.M. (collectively, "Children").  Upon review, we affirm.

On November 22, 2023, the York County Office of Children and Youth (the "Agency") obtained emergency custody of Children after investigating allegations that their mother, S.L. ("Mother"), had mental health and

substance abuse issues.[1]  Additional allegations included that Mother brought Children and their two older half-siblings[2] to Pennsylvania to live with her boyfriend and ended up homeless; that Mother dropped Children off at an emergency daycare with the intention of going to a methadone clinic but, instead, went to get her nails done; and that the daycare had concerns about unexplained injuries to one of the children.  At this time, Father resided in Texas.

On February 15, 2024, the trial court adjudicated Children dependent and ordered Children to remain placed in foster care.  The Agency implemented a Family Service Plan and requested that Father cooperate with the Interstate Compact on the Placement of Children ("ICPC") process so that he could be a placement resource for Children, participate in a substance abuse evaluation and comply with recommendations, participate in domestic violence treatment, and participate in parenting classes.  Additionally, the Agency scheduled video call visits between Father and Children one evening per week for thirty minutes.  The court continued to hold regular permanency review hearings.

---

[1] The trial court also terminated Mother's parental rights to Children on December 3, 2025.  Mother filed a separate appeal at Docket Nos: 42 MDA 2026, 43 MDA 2026, 44 MDA 2026, and 45 MDA 2026 and is not a party to this appeal.

[2] Children's older siblings have a different father and are not a party to this appeal.

Father continued to live in Texas with his mother ("Paternal Grandmother"). Father was initially cooperative with the ICPC process and Texas approved his ICPC. Father completed a domestic violence course online and provided the Agency with a certificate. Father also obtained a substance abuse evaluation but was reluctant to follow the recommendations of the evaluation, which caused a delay in Pennsylvania approving the ICPC. The Agency had to make a re-referral for an ICPC. Father remained consistent in attending the weekly video visits with Children and he attended one supervised in-person visit with Children following a court hearing. In April of 2025, Paternal Grandmother told Father that she was no longer willing to participate in the ICPC process, which prompted Father to request that the Agency withdraw the ICPC referral. Father expressed to the Agency that he was willing to voluntarily relinquish his parental rights to Children. Based on Father's representation, the Agency withdrew the ICPC referral.

On September 24, 2025, the Agency filed petitions to terminate Father's parental rights. The trial court appointed legal counsel for Children and held a hearing on December 2, 2025. Father failed to appear and his counsel made an oral motion for a continuance. In response, the Agency informed the trial court that they filed an affidavit of service after a process server in Texas personally served Father at his home address. The Agency also admitted into evidence Exhibit B, which was an email that Father sent to the Agency and his counsel referencing the termination of parental rights paperwork, which included the date of the hearing, and the fact that he was served with it. The

court denied Father's oral motion for continuance. By agreement of the parties, the dependency proceeding findings were incorporated into the termination of parental rights hearing. Additionally, the court heard testimony from Destiney Michael, Agency caseworker; Stephanie Tordoroff, art therapist for J.M.; Kristie Litzinger, foster mother for A.M.; Sharon Stites, foster mother for J.M. and older half-siblings.

Ms. Michael testified in accordance with the above-stated facts. Additionally, she testified that during the single in-person visit between Father and Children, Father "struggled to maintain [] Children during the visit" and that the Agency had some safety concerns. N.T. Hr'g, 2/2/25, at 95. Specifically, Ms. Michael testified that Father took Children to Chick-fil-A for dinner and explained that Children ran into the kitchen at Chick-fil-A and had to be escorted out by staff. Ms. Michael stated that Father has not provided any financial assistance for Children while they have been in the care of the Agency and has not performed any parental duties for Children. Ms. Michael testified that it was in Children's best interest to terminate Father's parental rights. She explained, "being in this place of in between and having visits and not really knowing what's going to happen I think is causing them more harm than good. I think they need to know where they're going to end up and know that they're going to have a safe home and a stable school and stable services to help relieve some of their anxieties." *Id.* at 99.

Ms. Tordoroff testified that she has provided art therapy to J.M. since November 2024 and is working on his generalized anger that occurs without trigger.

Ms. Litzinger testified that A.M. has been placed with her since November 2023. She explained that A.M. calls her and her husband "mom" and "dad," is bonded to everyone in the household, and looks to foster parents for comfort, supports, needs, and affection. Ms. Litzinger explained that A.M. has some escalating behavioral challenges including hitting, being defiant, and climbing furniture to access restricted items, and that she is looking into services that might help A.M. She confirmed that Father participates in his weekly virtual visits from 5:30-6:00 PM every Tuesday, and that they go "as well as could be expected at [A.M.]'s age." *Id.* at 54. She explained that A.M. recognizes that he has "two mommies" and "two daddies." *Id.* at 51. She testified that Father has "sent gifts occasionally. . . [m]aybe two or three times." *Id.* Ms. Litzinger testified that A.M. has only had one in-person visit with Father, despite the fact that she has expressed to Father that they would cancel all plans to make another in-person visit happen. She confirmed that she schedules visits and activities with A.M.'s older siblings and that she remains a pre-adoptive resource for A.M.

Ms. Stites testified that she has been J.M.'s foster parent since September 2024. She explained that J.M.'s older siblings, C.L. and H.L., also live with her. She testified that J.M. has behavioral issues at home and at school, including hitting, pinching, and acting defiantly. She further testified

that J.M. has a strong bond with his siblings. She explained that J.M. calls her and her husband "Sharon" and "Todd" or "Mama Sharon" and "Papa Todd," and that J.M. goes to both foster parents for comfort when he is upset. She informed the court that they are initiating family therapy for J.M. and his siblings soon. Ms. Stites testified that Father is consistent with the weekly virtual visits, and that J.M. enjoys seeing Father's pet rat. She further testified that Father had sent J.M. a gift for his birthday and Christmas. She explained that J.M. does not mention Father outside of the visits. Ms. Stites confirmed that she remains a pre-adoptive resource for J.M. and his siblings.

At the conclusion of the hearing, the court terminated Father's parental rights to Children pursuant to Section 2511(a)(1), (2), (5), (8), and (b). Children's guardian *ad litem* ("GAL") and A.M.'s legal counsel agreed with this disposition. J.M.'s legal counsel was unable to ascertain J.M.'s position.

Father timely appealed. Father and the trial court both complied with Pa.R.A.P. 1925.

Father raises the following issues for our review.

1. Whether the [trial] court erred in terminating the parental rights of Father pursuant to Sections 2511(a)(1), (2), (5), and (8) of the Adoption Act[?]

2. Whether the [trial] court erred in concluding that termination of parental rights would best serve the needs and welfare of the child pursuant to Section 2511(b) of the Adoption Act[?]

3. Whether the lower court abused its discretion in denying [F]ather's counsel's oral request for a continuance?

Father's Br. at 6-7 (some capitalization omitted).

\* \* \*

In cases involving the involuntary termination of parental rights, this Court's review "is limited to determining whether the trial court's determination is supported by competent evidence." ***In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the trial court's findings of fact and credibility determinations if the record supports them. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. ***T.S.M.***, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." ***Id.*** Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody[,] and control of their children. It cannot be denied that significant and permanent consequences for both the

parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." **L.A.K.**, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **Id.** at 592 (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." **In re Adoption of A.C.**, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." **Id.** (citation omitted). "[I]f the court determines that the parent's conduct warrants termination of his or her parental rights[,]" the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." **Id.** (citation omitted).

Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the

termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). We concentrate our analysis on subsection 2511(a)(1).

Section 2511(a)(1) provides that the trial court may terminate parental rights if the petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. *K.Z.S.*, 946 A.2d at 758. Our Supreme Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*L.A.K.*, 265 A.3d at 592 (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances." *Id.* (citations and internal quotation marks omitted). "To that end, even where the evidence clearly establishes [that] a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citation and internal quotation marks omitted).

> Our Supreme Court has explained:
>
> Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). . . . It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case.

*Id.* Notably, "a parent's efforts to enforce his or her legal custody rights unquestionably establishes the affirmative performance of a positive parental duty[.]" *Id.* at 594. Finally, "[w]ith respect to any petition filed pursuant to subsection (a)(1) . . . the court shall not consider any efforts by the parent to

- 10 -

remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

* * *

In his first issue, Father avers that the trial court erred in terminating his parental rights to Children pursuant to Section 2511(a)(1). Father's Br. at 13. Father argues that he continued to make efforts to achieve the goal of reunification throughout the case and that he did perform parental duties for Children. *Id.* at 15. Father further argues that this is evidenced by the fact that he participates in consistent weekly virtual visits with Children, sends gifts for Children, and communicates with Children's foster parents in a polite and respectful manner. *Id.* at 16.

Father's assertion that he continued to make efforts to reunify with Children and performed parental duties for Children while they were in the Agency's custody, however, is belied by the record. The record reflects that Father was resistant in following the recommendations of his substance abuse evaluation, had only one in-person visit with Children, failed to provide for Children financially, and saw Children virtually for a mere 30 minutes per week. Notably, it is undisputed that in April 2025, Father informed the Agency that he wanted the ICPC withdrawn, that he was no longer pursuing reunification, and that he wished for Children to be adopted.

The court placed great weight on Father's refusal to be a reunification resource for Children and his failure to progress past supervised visitation. The court opined:

> The [c]ourt emphasizes that, in April of 2025, Father specifically requested the ICPC be withdrawn, as he unequivocally represented to the Agency and the [c]ourt that he was **no longer [a] resource for [C]hildren**, and continued to represent the same until the time of the termination proceedings, causing months of wasted time and delay that could have been put toward the ICPC process. [C]hildren have been in Agency care since November 2023, yet Father continued to require supervised visitation, continued to waffle about whether he was a stable resource for [C]hildren, and willfully absented himself from the termination proceedings. Given the aforementioned facts, the [c]ourt did not err in finding that Father has evidenced a settled purpose of relinquishing his parental claim and has failed to perform his parental duties.

Trial Ct. Op., 2/3/26, 11-12. The record supports the trial court's findings.

Father has clearly failed to provide consistently for the physical and emotional needs of Children and maintain a place of importance in their lives. As we stated above, "a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *L.A.K.*, 265 A.3d at 592 (citation and internal quotation marks omitted). Father essentially resigned from his parental role when he requested the withdrawal of the ICPC and declined to be a reunification resource for Children. We discern no abuse of discretion in the trial court's termination of Father's parental rights pursuant to Section 2511(a)(1).

* * *

Regarding Section 2511(b), our analysis focuses on the effect that terminating parental rights will have on the child. We review the court's conclusion as to "whether termination of parental rights would best serve the

developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).  It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).  "The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Int. of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023) (citations and internal quotation marks omitted).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa. Super. 2018) (citation omitted).  If a bond exists, the court must consider whether terminating parental rights would destroy an "existing, necessary, and beneficial relationship." *K.T.*, 296 A.3d at 1109 (citation omitted).  However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.  The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *K.Z.S.*, 946 A.2d at 762–63.

Finally, in weighing the difficult factors discussed above, courts "must keep the ticking clock of childhood ever in mind.  Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *K.T.*, 296 A.3d at 1108 (citation and emphasis

- 13 -

omitted). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Father avers that the trial court erred when it terminated his parental rights pursuant to Section 2511(b). Father's Br. at 23. Father argues that his regular weekly video calls with Children is evidence that he has an established bond with Children. *Id.* at 25. Father's arguments are devoid of merit.

While Father's weekly 30-minute video visits might create a superficial bond with Children, they certainly do not create the type of parent-child bond that comes from the consistent, day-to-day involvement in meeting a child's physical and emotional needs. The trial court considered Children's young ages, the fact that they have been in foster care for two years, their relationship and bond with their respective foster families, and Children's need for permanency in determining that termination of Father's parental rights is in Children's best interest. *See* Trial Ct. Op. at 15-16. The trial court opined: "[t]he best interests of A.M. and J.M., coupled with their need for permanency after the ordeal of a 24[-]month dependency action, necessitated termination in this case. The [c]ourt did not err in finding that the dictates of [Section] 2511(b) favored termination of Father's parental rights." We agree.

Our review of the record supports the trial court's findings. Children have been in placement for over two years, have only had one in-person supervised visit with Father, only know Father as a person who appears on a screen every week for 30 minutes, are bonded to their respective foster

families, and are receiving necessary services in their respective foster homes. As stated above, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *K.Z.S.*, 946 A.2d at 762–63. Father's argument that his 30-minute video visits created a necessary and meaningful bond with Children is unavailing. Based on the evidence, it was not an abuse of discretion for the trial court to conclude that a termination of Father's parental rights was in Children's best interest.

* * *

In his final issue, Father avers that the trial court abused its discretion when it denied Father's counsel's oral request for a continuance at the start of the termination of parental rights hearing "because Father asserted to his counsel that he was not aware of the [termination of parental rights] hearing and, therefore, could not attend do to work obligations (even by Zoom)." Father's Br. at 26.

We review a trial court's denial of a continuance request for an abuse of discretion. *Int. of D.F.*, 165 A.3d 960, 965 (Pa. Super. 2017). We note initially that "neither the Adoption Act nor the cases interpreting it require that a parent must be present in order for a court to grant" a termination of parental rights petition. *Id.* The Act merely requires that "[a]t least ten days' notice shall be given to the parent or parents, putative father, or parent of a minor parent whose rights are to be terminated, by personal service or by registered mail to his or their last known address or by such other means as

the court may require." 23 Pa.C.S. § 2513(b); *see In re K.B.*, 763 A.2d 436, 440 (Pa. Super. 2000) (finding affidavits of service support trial court's finding that the parents received notice of parental rights termination hearing).

> Once a court is satisfied that a parent has received notice of the hearing, it is then entirely within the trial court's discretion to make a ruling on the continuance request based on the evidence before it.  As in all matters involving parental rights, the best interests of the child are paramount.  Accordingly, the exercise of the trial court's discretion includes balancing the evidence submitted in support of the request against other relevant factors, such as a parent's response and participation, or lack thereof, in prior proceedings and appointments important to the welfare of the child.  Most importantly, the trial court is in the best position to factor in the impact that further delay will have on the child's well-being.

*D.F.*, 165 A.3d at 965.

Here, the Agency presented the trial court with evidence that Father had been personally served in Texas by a process server, after which Father sent an email to both the Agency and his counsel attaching a screenshot of the termination of parental rights paperwork including the date of the hearing. The trial court found that "Father failed to appear for the proceeding despite having received proper notice of the date and time[.]"  Trial Ct. Op. at 9.  In denying the continuance, the trial court considered that 1) the trial court ensured video conferencing was available at the time of the hearing; 2) the termination proceeding involved the coordination of 9 attorneys and a continuance or bifurcation would have "wasted enormous judicial resources by requiring the duplication of witnesses, testimony, and evidence[;]" and 3) Father was represented by counsel who was permitted the opportunity to

- 16 -

cross-examine witnesses and make argument to represent Father's interests. *See id.* at 9-10. Once the trial court received evidence that Father had been served with notice of the hearing, it was well within its discretion to deny Father's last-minute oral request for a continuance. We discern no abuse of discretion.

* * *

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Father's parental rights pursuant to Sections 2511(a)(1) and (b). In light of our disposition, we decline to address Father's arguments as they relate to other subsections of Section 2511.

Orders affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/13/2026